## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 2:06-CV-14201-ROSENBERG/LYNCH

GLENN C. SMITH,

      Plaintiff,

v.

FLORIDA DEPARTMENT
OF CORRECTIONS,

      Defendant.

_____ /

### <u>MEMORANDUM OPINION</u>

      This action for injunctive and declaratory relief was tried before the Court from March 2, 2015, to March 6, 2015.  The Plaintiff, Glenn C. Smith, is an incarcerated prisoner in the Florida Department of Corrections—the Defendant in this case.  Plaintiff, who was appointed private counsel after the Eleventh Circuit Court of Appeals reversed and issued an opinion in this case on February 20, 2013, has brought this action under the Civil Rights Act, 42 U.S.C. § 1983.

      Plaintiff alleges that after he exercised his First Amendment right to file grievances and lawsuits against Defendant, he was transferred on March 18, 2003 from one correctional institution, Martin Correctional Institution, to another, Okeechobee Correctional Institution, in retaliation for his aforementioned litigation activities.  Although the operative complaint in this case could be construed to encompass other allegations and claims for relief (it was drafted while Plaintiff was proceeding pro se), counsel for all Parties agreed at trial that the issue before the Court is whether Plaintiff's transfer on March 18, 2003 was in retaliation for Plaintiff's exercise

of his First Amendment rights and, if so, whether Defendant has a policy and practice of retaliatory transfers.

Based on the evidence presented at trial, the memoranda submitted, and oral argument of the Parties, this Court makes the following findings of fact and conclusions of law:

## I.      FINDINGS OF FACT

### A.  Witnesses for the Plaintiff

Plaintiff's case in chief consisted of testimony from thirteen inmates currently incarcerated in the Florida Department of Corrections.  Four of these witnesses testified before the Court in person and the remaining witnesses testified via deposition.  The Court summarizes the testimony of each witness in turn.

### 1.  Mr. Glenn Smith.

Plaintiff was the first witness to testify.  Plaintiff has been incarcerated in the Florida Department of Corrections since 1992.  Plaintiff testified that, prior to the events that gave rise to this suit in 2003, he filed approximately fifteen to twenty lawsuits against Defendant (as well as employees of Defendant) and somewhere between one hundred and two hundred administrative grievances.  Plaintiff continued to file lawsuits and grievances even though he was transferred at least three times, as he believed, in retaliation for his litigation activity.[1]  As of February, 2003, Plaintiff was content with the institution at which he was housed, Martin Correctional, for various reasons including the fact that he had been assigned a single-bunk cell which he considered to be a privilege.

---

[1] At trial, Defendant objected to the Court's consideration of Plaintiff's testimony as it pertained to allegations of prior retaliatory transfers because, Defendant argued, those allegations were not contained in Plaintiff's complaint. The Court has considered Plaintiff's testimony on this issue, however, because Plaintiff did allege prior retaliatory transfers in his complaint.  DE 230-1 at 4.

On February 26, 2003, Plaintiff filed a lawsuit in state court that pertained to medical care that he was receiving for a chronic itch.  When Plaintiff was later notified, on March 18, 2003, that he was being transferred to another institution, Plaintiff believed the transfer was in retaliation for the suit he had filed a few weeks prior.[2]  Plaintiff refused to voluntarily submit to the transfer and insisted that the order to transfer be verified.  The order was not, according to Plaintiff, verified, and after mental health professionals failed to convince Plaintiff to voluntarily submit to the transfer, Plaintiff was transferred out of his institution with physical force.  After exhausting his administrative remedies, Plaintiff filed the suit presently before the Court.

With respect to Plaintiff's activities subsequent to filing suit,[3] Plaintiff testified that the total amount of lawsuits he has filed during the course of his incarceration number somewhere between sixty and seventy and, counting appeals, he estimated that he is responsible for initiating two hundred cases in both state and federal courts.  With respect to administrative grievances, Plaintiff estimated that the total number he has filed during his incarceration is between two hundred and three hundred.

---

[2] Plaintiff also testified that filed a petition for mandamus against Defendant on February 2, 2003.  Plaintiff believed that he was retaliated against for this lawsuit as well.

[3] Defendant objected to the Court's consideration of alleged events of retaliatory transfer subsequent to March 18, 2003.  For reasons more fully developed below, however, the Court has considered the testimony of Plaintiff and other witnesses regarding alleged retaliatory transfers subsequent to March 18, 2003 because (i) such testimony is relevant to evaluating the credibility and weight of Plaintiff's evidence and allegations, (ii) such testimony is relevant evidence of whether Defendant has a policy and practice of retaliatory transfers, and (iii) Plaintiff seeks an injunction for present-day relief.  *See Calusinski v. Kruger*, 24 F.3d 931 (7th Cir. 1994); *see also Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1064 n.7 ("Relevant discovery in this case would necessarily include facts related to other inmates because '[t]o establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice.'" (quoting *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986)).  It follows, therefore, that the Court must consider the evidence of the policy and practice of Defendant in the present for the purposes of evaluating injunctive relief in the present although, as more particularly described below, an analysis of Defendant's policy and practices is ultimately concluded by the Court to be unnecessary.

2.  <u>Mr. Nathaniel Brazill.</u>

Mr. Brazill's testimony was very specific.  Mr. Brazill testified about an alleged retaliatory transfer when he was incarcerated at Desoto Correctional Institution in 2009.  Mr. Brazill filed a lawsuit against an official at that institution, a chief of security, on September 11, 2009.  The subject of the suit was whether an inmate uniform policy contravened a Department of Corrections policy.  The defendant official in that suit was served on or about October 9, 2009.  At that time, Mr. Brazill was not at the institution because he had been transferred to the Palm Beach County jail for a hearing in a criminal case.  When Mr. Brazill returned to the institution he was placed into confinement.  Mr. Brazill remained in confinement until he was transferred on December 2, 2009 and, at a later time, he was notified by a classification officer and an assistant warden that the reason for his transfer was the lawsuit he had filed against the chief of security.

Mr. Brazill also testified that on July 22, 2010, he learned that the chief of security against whom his prior suit was directed had been reassigned to his new correctional institution.  Mr. Brazill was transferred on July 27, 2010 and he was again informed, by a classification officer, that the basis for the transfer was his prior suit against the chief of security.

3.  <u>Mr. Rexford Tweed.</u>

Mr. Tweed testified about a large number (approximately twenty) of transfers that he believed to be retaliatory.  Although Mr. Tweed alleged several different grounds upon which he believed the retaliation was based, Mr. Tweed did specify that most of his litigation and most of his grievances focused on the adequacy and accessibility of prison law libraries.  Although Mr. Tweed could not specify how many grievances he had filed during his incarceration, he did state

4

that he had filed hundreds of grievances.  Similarly, Mr. Tweed could not identify the specific number of lawsuits that he had filed during his incarceration, but he did describe several different suits against Defendant that he felt had resulted in a retaliatory transfer.

4.  Mr. Anthony Schiller.

Mr. Schiller testified that virtually all of his dozen or so transfers during his incarceration were for retaliatory reasons.  Some of the grievances that Mr. Schiller believes led to retaliatory transfers include a grievance over his termination from a law clerk position and another grievance that concerned an altercation over his bed linens.  Although Mr. Schiller could not specify the precise amount of grievances he had filed during his incarceration, it could be inferred from his testimony that he has filed approximately one thousand grievances or, at the very least, many hundreds of grievances.

5.  Mr. James Brown.

Mr. Brown testified via deposition (Plaintiff's Exhibit 32) that he was transferred in retaliation for an incident that involved his insistence over his need to use a restroom during a security check of his cell.  Although Mr. Brown's testimony was not entirely clear, it appears that he stopped filing grievances because of his belief that grievances filed in Defendant's central office resulted in random searches of his cell, retaliatory transfers, and other types of retaliatory activity.  Mr. Brown testified that he did not file lawsuits, only administrative grievances.

6.  Mr. Mark Osterback.

Mr. Osterback testified via deposition (Plaintiff's Exhibit 33) that he filed grievances over a variety of issues and that he was targeted for retaliation because he sought review over institutional actions at the central office level of the Department of Corrections.  Mr. Osterback

also testified that he believed several lawsuits and appeals that he had filed resulted in retaliatory transfers, and that he believed that winning a grievance or overturning a disciplinary action would ultimately result in a retaliatory transfer.

     7.  Mr. Leslie Brunskill.

Mr. Brunskill testified by deposition (Plaintiff's Exhibit 38) that he believed he had been transferred several times in retaliation for his filing of administrative grievances. Mr. Brunskill further testified that the subject of his grievances generally pertained to his religious beliefs, that he had been threatened—by prison officials—and that the threats generally sought to prevent him from filing further grievances. During the course of his incarceration, Mr. Brunskill estimated that he had filed approximately one hundred grievances.

     8.  Edwin Beatty.

Mr. Beatty testified by deposition (Plaintiff's Exhibit 40) that he believed he had been transferred on several occasions in retaliation for lawsuits and grievances that he had filed. Mr. Beatty further testified to his belief that his certification as an inmate law clerk was used as a pretextual justification for transfers. More specifically, Mr. Beatty testified that even though he was, at times, transferred from one institution to another to fulfill an alleged institutional law clerk need, he was not utilized as a law clerk at the receiving facility. During the course of his incarceration, Mr. Beatty estimated that he had filed hundreds of grievances.

     9.  Mr. David Reutter.

Mr. Reutter testified via deposition (Plaintiff's Exhibit 39), albeit briefly. The essence of Mr. Reutter's testimony was that he was threatened with a transfer to another institution if he did not cease his litigation activities.

10. Mr. Douglas Jackson.

Mr. Jackson testified via deposition (Plaintiff's Exhibit 41) that he been threatened with a transfer if he did not stop filing grievances.  More specifically, Mr. Jackson testified that he had been threatened with a transfer to an institution located deep inside the Florida panhandle.  In another instance, Mr. Jackson testified that he had been urged by a warden to cease grievance activity, and that the warden had further offered to cause Mr. Jackson to be transferred to any institution in the region that Mr. Jackson selected.  Mr. Jackson testified that he was responsible for hundreds of filings during his incarceration.

11. Mr. George Rivera.

Mr. Rivera testified by deposition (Plaintiff's Exhibit 42) that it was his belief he had been transferred in retaliation for, *inter alia*, litigation pertaining to law libraries and advocating for certain administrative rule changes.  Mr. Rivera further testified that was informed, by a warden, that if he did not cease his litigation activities he would be transferred to an institution far away from his family.  Finally, Mr. Rivera testified that he had filed three or four lawsuits against officials in the Department of Corrections, that he had filed hundreds of administrative grievances, and that he had filed "many" complaints for outside investigation into administrative rules of the Department.

12. Mr. Drew Hartley.

Mr. Hartley testified via deposition (Plaintiff's Exhibit 43) to his belief that as a result of filing administrative grievances he was transferred several times in retaliation.  Mr. Hartley further testified that he was threatened as a result of his grievance writing, and that he believed a shank-weapon was planted into his cell in order to place him in close confinement and thereby

justify his transfer to another institution.  Mr. Hartley testified that he had filed approximately eight hundred grievances during his incarceration.

13. Mr. Jose Charriez.

Mr. Charriez testified via deposition (Plaintiff's Exhibit 44) that he was transferred in retaliation for his First Amendment litigation activity on at least two occasions.  Although Mr. Charriez's testimony as to his first alleged retaliatory transfer lacks clarity (it involved an investigation at his institution), Mr. Charriez did specify that his second alleged retaliatory transfer was in response to a restraining order that he had sought against a Department of Corrections official.

**B.  Witnesses for the Defendant**

In response, Defendants called three witnesses who either work or worked for the Department of Corrections: Ms. Vicki Newsome, Ms. Darlene Lumpkin, and Ms. Mary Ellen Dayan-Varnum.  The Court summarizes the testimony of each witness in turn.

1. Ms. Vicki Newsome.

Ms. Newsome provided extensive testimony on the internal procedures that the Department of Corrections uses to process and approve the transfer of inmates from one institution to another.  She is an assistant bureau chief at the Department and has been employed there, in various capacities, for approximately twenty-five years.   In 2003, Ms. Newsome testified that the Department oversaw approximately one hundred and fifty thousand transfers for an inmate population of about seventy-eight thousand.  The transfer procedures utilized by the Department were formalized in a written document in 2005.  Prior to that time, including the time at issue in this case in 2003, a formal transfer procedures policy did not exist in a

centralized, written form, however, Ms. Newsome testified that the procedures utilized in 2003 were "substantially the same" as the procedures delineated in the 2005 manual (Defendant's Exhibit 2).

Ms. Newsome testified about two broad categories of prison transfers: routine transfers and non-routine transfers.   Routine transfers, she clarified, are commonly initiated at the institutional level.   These types of transfers can be for a wide range of reasons, including good behavior, bad behavior, education programs, substance abuse programs, or fulfillment of an institutional need if an inmate's particular skills are needed at another institution.   These types of transfers are also used when an inmate is determined to represent a security threat to the safe and orderly operation of an institution.   Even though these types of transfers can be initiated or requested at the institutional level by a classification officer, the transfer must still be approved by the institutional classification team (which consists of a warden or assistant warden, a colonel, and a classification supervisor) as well as a state classification officer in the central office of the Department of Corrections.

Ms. Newsome also testified as to transfers she classified as non-routine transfers.   Non-routine transfers, she explained, can be for the specific medical needs of an inmate or for a large-scale population adjustment.   Ms. Newsome expounded on the procedures surrounding a population adjustment because, as discussed in more detail below, it is Defendant's position that Plaintiff's transfer on March 18, 2003, was a population adjustment transfer.

According to Ms. Newsome, a population adjustment transfer is when an inmate is moved as part of a larger plan to equalize or balance the bed capacity (as well as medical services capacity) of the various institutions in the Department of Corrections.   For example, a

population adjustment transfer becomes necessary when a prison dormitory is closed, as every inmate at the closing dormitory must be moved to another location that meets the medical and security classification needs of the inmate. According to Ms. Newsome, no-one outside of the population management office at the Department of Corrections can request a general population adjustment transfer.

Ms. Newsome testified that in 2003 the institution at which Plaintiff was housed, Martin Correctional Institution, was an institution that was able to house "S-3" inmates. "S-3" inmates are prisoners who have certain mental health needs. She further testified that Plaintiff was selected as part of a large-scale plan to move non S-3 inmates out of Martin Correctional Institution. Plaintiff was a non S-3 inmate. The reason non S-3 inmates had to be transferred out of Martin in 2003, Ms. Newsome testified, was because a dormitory at another correctional institution, Everglades Correctional Institution, was being closed. The Everglades S-3 inmates had to be transferred to a facility that could accommodate S-3 inmates, and Plaintiff's facility, Martin Correctional Institution, was selected for this purpose. Plaintiff was therefore transferred out of Martin Correctional Institution in order to make room for incoming S-3 inmates, and Plaintiff and other inmates were transferred to the closest institution that could accommodate Plaintiff's security classification—Okeechobee Correctional Institution.

Ms. Newsome's testimony on this matter was based upon information she reviewed in the Department's files and, perhaps most importantly, on a spreadsheet she located in Department records. This spreadsheet was admitted into evidence (Defendant's Exhibit 6). The spreadsheet contains information that was used in the planning of a large-scale transfer of inmates that resulted from the closing of a dormitory at the Everglades Institution. The spreadsheet is entitled

"Overview of Current Plan for Transfers out of Everglades C.I. – March 2003" and the columns in the spreadsheet show that S3 inmates had to be transferred to Martin Correctional Institution.[4] At the bottom of the spreadsheet, an entry reads: "This plan also requires movement of 55 inmates out of Martin within Region IV.  Martin will be moving: 10 Glades, 15 Desoto Annex, 15 Hardee and 15 Okeechobee.  As soon as these are approved, we will begin immediate movement out of Martin to make room for the S-3's coming out of the other regions in there." With respect to *which* fifteen inmates were chosen to be transferred out of Martin Correctional Institution to the institution in Okeechobee, Ms. Newsome testified that these inmates would have been selected by the state classification office at the Department.  Plaintiff's selection as part of these fifteen inmates is addressed by the testimony of a separate witness—Ms. Darlene Lumpkin.

Turning to Ms. Newsome's remaining testimony, Ms. Newsome testified at length as to the official reasons Plaintiff's witnesses were transferred.  Although, as briefly summarized above, all of Plaintiff's witnesses subjectively believed that they had been transferred for retaliatory reasons stemming from their exercise of First Amendment rights, Ms. Newsome clarified the official basis for the witnesses' transfers.  Some of these reasons Defendant officially recorded[5] as the basis for the aforementioned transfers are set forth below:

- Mr. Brazill was transferred because his litigation against multiple staff members at his institution presented a security threat to the safe and orderly operation of the facility;

- Mr. Tweed was transferred in order to place him in closer proximity to his mother, for unsatisfactorily integrating himself into the population at a

---

[4] Plaintiff objected to both the admission of the spreadsheet and Ms. Newsome's testimony on this matter.  The gravamen of Plaintiff's objection, and the focus of Plaintiff's cross-examination, was that the spreadsheet did not indicate that it was a final document.
[5] Defendant admitted into evidence the transfer records of the inmates referenced below.

11

specific institution, for his specific medical needs, for his access to hearings in federal court, and for the discovery of a handcuff key hidden in his legal materials;

- Mr. Schiller was transferred to accommodate a mental health condition, for population adjustment, for recorded behavior issues, for the discovery of marijuana in his cell, for the discovery of marijuana in his legal papers, and for his personal request to be transferred because he was concerned for his own personal safety;

- Mr. Brown was transferred as part of a population adjustment (the same alleged population adjustment transfer that included Plaintiff);

- Mr. Brunskill was transferred as part of a population adjustment;

- Mr. Beatty was transferred as part of a population adjustment, for an institutional need for a law clerk, and for the Department's belief that Mr. Beatty was engaging in gang activity;

- Mr. Osterback was transferred as part of a population adjustment and because a certain institution had lost credibility with Mr. Osterback due to Mr. Osterback successfully overturning several disciplinary reports; and

- Mr. Rivera was transferred for the Department's belief he was engaging in gang activity and for mental health reasons.

2. <u>Ms. Darlene Lumpkin.</u>

Ms. Lumpkin, although presently employed by the Department of Corrections as an assistant warden, was previously employed in the Department's state classification office. Ms. Lumpkin worked at the state classification office at the time Plaintiff was transferred out of Martin Correctional Institution. Based upon Department records, Ms. Lumpkin testified that she was the employee at the Department who selected Plaintiff to be transferred out of Martin. Her testimony on this matter was based upon her pattern and practice of selecting inmates for transfer and upon the fact that her personal identity code was recorded in the file that showed Plaintiff's selection for the general population adjustment transfer discussed above.

12

Because Ms. Lumpkin's pattern and practice was central to her testimony, Ms. Lumpkin expounded upon her methodology for selecting inmates for transfer.  Once Ms. Lumpkin was notified that a group of inmates had to be selected for a population adjustment transfer, Ms. Lumpkin would begin the selection process by generating a list of inmates at the originating facility (here, Martin Correctional Institution).  This list was generated using the criteria the population management office forwarded to the classification office.  For example, if a population adjustment transfer required non S-3 inmates, the list would only include inmates that met those criteria.  Ms. Lumpkin said that her practice, which she never deviated from, was to move down the list, inmate by inmate, and determine whether each inmate was compatible with the destination facility.  For example, an inmate could not be selected for transfer if the destination facility could not accommodate the medical or security classification needs of the inmate.  If an inmate had no conflicts with the destination facility, Ms. Lumpkin would select that inmate and move to the next name on the list.  If an inmate was incompatible with the destination facility, Ms. Lumpkin would not select that inmate and would move to the next name on the list.  Most importantly, Ms. Lumpkin testified that she never selected an inmate with knowledge of the inmate's litigation or grievance activities.[6]  Because Ms. Lumpkin's identity code appears in the Department record that shows Plaintiff's selection for transfer (Defendant's Exhibit 55), Ms. Lumpkin testified that she selected Plaintiff according to her pattern and practice outlined above.  It was therefore Ms. Lumpkin's testimony that Plaintiff was selected, by her, without any knowledge on her part of Plaintiff's first amendment activity.

---

[6] Ms. Lumpkin did expound on one possible exception—when an inmate's litigation resulted in a security conflict with a destination facility, the conflict would be recorded into the inmate's record and that inmate would *not be selected for transfer*.  This scenario is briefly discussed in the Court's conclusions of law, *infra*.

On cross examination, Ms. Lumpkin admitted that she had no direct recollection of selecting Plaintiff for his 2003 transfer.  Given the passage of approximately twelve years, however, Ms. Lumpkin's lack of a specific recollection is understandable.  Plaintiff's theory on cross examination appeared to be that Plaintiff could have been selected by an alternative procedure whereby Plaintiff was selected not by Ms. Lumpkin, but instead by an institutional classification team at Martin Correctional.   Plaintiff's argument was essentially that Ms. Lumpkin could have merely *approved* the selection of Plaintiff instead of actually *selecting* him.  Based upon the Court's observation of Ms. Lumpkin's testimony on cross examination, it is the finding of the Court that Ms. Lumpkin disputed this contention of Plaintiff and insisted that she had personally selected Plaintiff because (i) the transfer at issue was a population adjustment transfer of notable size and (ii) her name would not appear in Plaintiff's record for this type of population adjustment transfer if she had not personally selected Plaintiff.   Moreover, Ms. Lumpkin testified on rebuttal that she had no recollection of Plaintiff's proffered alternative procedure ever being used during her time in the state classification office.

Ms. Lumpkin's testimony warrants discussion on one last point.  In a prior reversal in this case, the Eleventh Circuit noted the following:

> The FDOC submitted evidence that transfers for population adjustment are permitted under statute and policy to meet prison needs, including preserving medical resources and security. However, no evidence was submitted stating what prison need required that Smith, as opposed to any other inmate, be transferred. Thus, there remains a fact-question as to why Smith was included in the group of 50 inmates transferred from MCI. Someone selected 50 inmates for transfer, Smith is entitled to know how and why these selections were made

*Smith v. Fla. Dep't of Corr.*, 713 F.3d 1059, 1064 n.6 (11th Cir. 2013).  The question posed by the Eleventh Circuit was therefore the question of how Plaintiff was selected for transfer, and

14

Ms. Lumpkin's testimony was Defendant's proffered answer—that Plaintiff was selected based upon objective criteria unrelated to Plaintiff's First Amendment activities.

   3.   <u>Ms. Mary Ellen Dayan-Varnum.</u>

Ms. Varnum testified by deposition (which was not admitted as an exhibit). Ms. Varnum worked in the population management office at the Department of Corrections at the time Plaintiff was transferred. Ms. Varnum was shown the spreadsheet referenced above in Ms. Newsome's testimony. After reviewing the spreadsheet, it was Ms. Varnum's testimony that, due to the format and style of the document, she believed that she was the author. By implication it was therefore Ms. Varnum's testimony that she created the plan for the population adjustment that affected Plaintiff.

   **C.   Rebuttal by the Plaintiff**

After Defendant rested, Plaintiff called as a rebuttal witness Mr. Ronald McAndrews. Mr. McAndrews had no knowledge of the circumstances surrounding Plaintiff's transfer and instead testified as to his experiences as an official in the Department of Corrections in the context of how inmates were transferred and upon what grounds inmates were transferred. For the reasons set forth below, Mr. McAndrews' testimony, which was focused on Defendant's alleged pattern and practice of retaliatory transfers, is irrelevant to the decision of the Court and is therefore not restated here.

In summary, after reviewing the testimony and documentary evidence, the Court makes the following findings of fact:

1.   Ms. Newsome was a knowledgeable and persuasive witness—she testified to her extensive experience as an employee with the Department of Corrections, in a variety of capacities, and she exhibited a deep knowledge of the procedures and mechanics surrounding inmate transfers. Although Plaintiff attacked the credibility of some of Ms.

15

Newsome's testimony as it pertained to Plaintiff's transfer in 2003, Plaintiff offered no affirmative evidence to counter Ms. Newsome's testimony on this matter. Ms. Newsome's testimony was buttressed and supported by the testimony of Ms. Varnum.

2. Ms. Lumpkin was also a credible and persuasive witness. Ms. Lumpkin, like Ms. Newsome, testified to her extensive experience as an employee in the Department of Corrections. Although Plaintiff attacked the credibility of some of Ms. Lumpkin's testimony as it pertained to Plaintiff's transfer in 2003, Plaintiff offered no affirmative evidence to counter Ms. Lumpkin's testimony on this matter. Ms. Lumpkin's testimony was buttressed and supported by the testimony of Ms. Newsome and Ms. Varnum. The Court found Ms. Lumpkin's explanation for Plaintiff's selection for transfer to be truthful and credible—that Plaintiff was selected based upon objective criteria unrelated to his First Amendment activities.

3. Because the Court finds the testimony of Ms. Newsome and Ms. Lumpkin to be persuasive and credible, and because Plaintiff has provided no affirmative evidence to the contrary, the Court finds that Plaintiff was selected as part of a population adjustment transfer, by Ms. Lumpkin, without any knowledge on Ms. Lumpkin's part of Plaintiff's litigation activities.

4. The sole fact in evidence to support Plaintiff's contention that he was transferred in retaliation for his First Amendment activities was the proximity of time between the *filing* of his lawsuit and his transfer.[7]

5. Plaintiff has filed a very large number of lawsuits and administrative grievances during his incarceration.

6. The vast majority of witnesses for Plaintiff filed a very large number of lawsuits and administrative grievances during the period of their incarceration.

7. It was the subjective belief of all of the witnesses in Plaintiff's case in chief that their filing of grievances and lawsuits resulted in retaliatory transfers, and that the vast majority of their transfers were retaliatory based upon such filings.

8. Notwithstanding the subjective belief of Plaintiff's witnesses, Defendant submitted into evidence documented reasons for most of the transfers of the witnesses that showed objective reasons for the transfers that had no connection to the witnesses' exercise of their First Amendment rights.

---

[7] Plaintiff conceded at closing argument that he relies solely upon this piece of evidence to establish that his specific transfer was retaliatory.

## II.     CONCLUSIONS OF LAW

For an inmate to prevail in a retaliatory transfer claim, the inmate must show:

> (1) he engaged in constitutionally protected conduct; (2) the defendant's retaliatory act adversely affected the protected conduct; and (3) there is a causal connection between the retaliatory act and the adverse effect on the conduct. Once the plaintiff establishes that the protected conduct was a motivating factor behind the harm, the burden of production shifts to the defendant. The defendant can prevail … if it can show it would have taken the same action in the absence of the protected activity.

*Smith v. Fla. Dept. of Corr.*, 713 F.3d 1059, 1063 (11th Cir. 2013). The first element is easily satisfied in this case, as conceded by Defendant, since the conduct at issue in this case was Plaintiff's exercise of his First Amendment right to file lawsuits. Similarly, Plaintiff's allegations would also appear to easily satisfy the second element as an inmate cannot be transferred in retaliation for his or her exercise of First Amendment rights. *See Bennett v. Hendrix*, 423 F.3d 1247,1252-53 (11th Cir. 2005); *Bridges v. Russell*, 757 F.2d 1155, 1157 (11th Cir. 1985).[8] The element at issue in this case is the third element, causation.

There is no individual defendant in this case, only the Department of Corrections. The Department is not subject to respondeat superior liability, however, and as a result it cannot be held liable under § 1983 for the actions of its employees and officials. *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990). Plaintiff therefore carries the heavy burden of proving that the Department was "subjectively motivated to discipline" him for exercising his First Amendment rights and that the Department directly participated in the alleged constitutional deprivation. *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008); *Brown*, 906 F.2d at 671. Where direct

---

[8] The Court does note the incongruity in finding, however, that a person of "ordinary firmness" would be discouraged from filing grievances and lawsuits when threatened with a retaliatory transfer when the evidence before the Court is that, notwithstanding their collective belief that they had been transferred in retaliation for First Amendment activity many, many times, Plaintiff's witnesses are collectively responsible for thousands of administrative grievances despite their belief that grievances result in retaliatory transfers. *See Bennett v. Hendrix*, 423 F.3d 1247, 1254-55 (11th Cir. 2005).

participation is not alleged, as in this case, causation can be established by showing the deprivation occurred through an official policy, unofficially adopted policy or custom that the Secretary implemented or allowed. *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986).

However, when claims are brought against policymakers on that basis, "rigorous standards of culpability and causation must be applied" to ensure the policymaker is not held liable solely for the actions of its employees. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997). Defendant must have been the "moving force" behind Plaintiff's injury. *Id.* at 404.

This rigorous standard of culpability is of particular concern when an inmate claims retaliation. Claims that prison officials' decisions were made for retaliatory purposes "are prone to abuse. Virtually every prisoner can assert such a claim as to every decision which he or she dislikes." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). Because of this "near inevitability" and the "ease with which claims of retaliation may be fabricated," those claims must be examined with "skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). To prevail, Plaintiff must do more than make "general attacks" upon a defendant's motivations and must articulate "affirmative evidence" of retaliation to prove the requisite motive. *Crawford-El v. Britton,* 523 U.S. 574, 600 (1998).

As conceded by Plaintiff at trial, Plaintiff must first show that his own transfer was retaliatory before evidence pertaining to Defendant's alleged retaliatory policies becomes relevant. *See Smith*, 713 F.3d at 1063-64. For the reasons set forth below, Plaintiff has failed to prove that his transfer on March 18, 2003 was in retaliation for his First Amendment activity.

Plaintiff has the initial burden of establishing a prima facie case of retaliation. *Id.* at 1063. If Plaintiff establishes that his conduct was a motivating factor behind the alleged

18

retaliatory transfer, a burden of production shifts to the Defendant to show the transfer was non-retaliatory. *Id.* Although the Eleventh Circuit's most recent decision in this case could be construed to include the conclusion that Plaintiff's evidence was sufficient to shift a burden of proof onto Defendant, the Court (i) does not construe the Eleventh Circuit's opinion as reaching this conclusion for the purposes of trial and (ii) the Court concludes that Plaintiff has failed to provide sufficient evidence to shift any burden onto Defendant.

The Court's reading of the Eleventh Circuit's most recent opinion in this case is that Plaintiff shifted the burden of production (for the purposes of a prior motion) to Defendant because the motion on appeal was Defendant's motion for summary judgment and, as a result, all factual inferences had to be construed in Plaintiff's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Examining the Eleventh Circuit's opinion in light of Plaintiff's burden at trial, the Court does not conclude that it is the law of the case that Plaintiff's evidence in opposition to Defendant's motion for summary judgment has had the effect, once produced at trial, of shifting any burden of proof onto Defendant.

With respect to the specifics of Plaintiff's failure of proof at trial, inferences must no longer be construed in Plaintiff's favor, and Plaintiff conceded that he has no evidence to establish his transfer was retaliatory except for the temporal proximity between the *filing* of his lawsuit and the timing of his transfer.[9] Moreover, Plaintiff relies upon a single, unpublished opinion from the Eleventh Circuit Court of Appeals that included the following:

> Although we have yet to hold in a published opinion that a close temporal proximity between protected speech and an adverse action *may* serve as

---

[9] Plaintiff does not appear to rely upon the timing of the *service* of the complaint in his suit, instead, Plaintiff's theory of the case appears to be that (i) mailroom employees at his institution communicated the substance of his suit to prison officials who then (ii) invoked an alternative and unusual procedure that resulted in Plaintiff being specifically included as part of an impending general population adjustment transfer.

circumstantial evidence of causation in a prisoner's First Amendment retaliation claim, we have determined in another type of retaliation case that temporal proximity is relevant to proving causation.

*Stallworth v. Tyson*, No. 13-11402, slip. op. at 6 (11th Cir. Aug, 27, 2014) (emphasis added). The evidence before the Court is, however, that Plaintiff is a prolific filer.  It logically follows that Plaintiff could subjectively believe a transfer was in retaliation for his litigation activities because, at any given time, Plaintiff would have multiple pending suits or grievances.  It is for this reason, *inter alia*, that claims that prison officials' decisions are made for retaliatory purposes "are prone to abuse. Virtually every prisoner can assert such a claim as to every decision which he or she dislikes."  *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). Moreover, the evidence before the Court is that Plaintiff's witnesses, like Plaintiff, testified to their belief that their transfers were retaliatory when many of those transfers were, from Defendant's perspective, for objective non-retaliatory reasons.  In conclusion, the Court finds in *this* case Plaintiff's temporal evidence is no evidence at all.  Hypothetically speaking, the Court's decision could be different (hence the Eleventh Circuit's usage of the term "may" in the case cited above) if, for example, Plaintiff filed very few lawsuits during his incarceration—with transfers occurring soon after—or if Plaintiff produced some other evidence that linked his filings to the alleged retaliatory transfer.[10]

Even if the Court were to conclude, however, that Plaintiff has produced sufficient evidence to shift the burden upon Defendant to prove Plaintiff's transfer was for non-retaliatory reasons, Defendant has met its burden.  As detailed above in the Court's findings of fact, the Court has concluded, based upon the evidence at trial, that Plaintiff was transferred as part of a general

---

[10] The situation where a lawsuit results in a security threat is an exception to this general principle addressed below.

population adjustment transfer and that he was selected for this transfer without any knowledge, on behalf of Defendant, of his litigation activities.  The Court therefore finds in the alternative that Defendant has carried its burden to prove Plaintiff was transferred for non-retaliatory reasons.

Because Plaintiff has failed to prove that his transfer was retaliatory, the evidence submitted by Plaintiff of Defendant's alleged policy of retaliatory transfers is irrelevant.  Due to the large volume of evidence that was admitted at trial on Defendant's policies, however, and due to the history of this case, which included two separate reversals by the Eleventh Circuit Court of Appeals, the Court does find that one last point bears discussion, even though it is irrelevant to the Court's decision.  Plaintiff emphatically emphasized the evidence submitted at trial that showed an inmate can be transferred, in some circumstances, specifically for filing a lawsuit against prison officials.  The testimony of Mr. Brazill was particularly targeted upon this topic.  Case law appears to show, however, that an inmate *can* be transferred for filing lawsuits or grievances, if the transfer is for a penological interest.

In *Ward v. Dyke*, the Sixth Circuit Court of Appeals found that transferring an inmate who submitted a "barrage" grievances constituted a legitimate penological interest: "The ability to transfer a prisoner who is interfering with prison administration and staff morale goes to the essence of prison management." *Ward v. Dyke*, 58 F.3d 271, 273-75 (6th Cir. 1995).  The court went on to state that qualified immunity protected officials who transferred an inmate because of the sheer number of grievances he filed, finding "[h]ere, the prison authorities were justified in concluding that Ward's behavior during his five months at ITF evidenced his discontentment with the facilities, staff, and fellow inmates at ITF. Ward's failure to adjust was detrimental to himself and also posed a potential threat to other inmates and the staff." *Id.* at 274-75.

Furthermore, in some circumstances prison officials may transfer an inmate who files grievances when those grievances are upheld.  In *Osterback v. Kemp*, which involved one of the witnesses offered by Plaintiff, Mark Osterback, the court found Osterback's transfer because of his filing of numerous grievances, many of which were upheld, was related to legitimate penological reasons:

> Prison security and safety depends entirely upon whether correctional officials have full and continuous control over the inmates in their custody. Control cannot be maintained if there is a lack of respect or resentment on either side, or a belief by the prisoner that he or she has a special status not enjoyed by other prisoners. Any breakdown in that authority, such as a loss of credibility of the supervising correctional officers, compromises legitimate penological interests.

*Osterback v. Kemp*, 300 F. Supp. 2d 1238, 1258 (N.D. Fla. 2003).  The decisions of the federal courts in these matters highlights the difficult and unique challenge that results from the need to balance an inmate's constitutional rights with the need to maintain order in a prison institution. The Supreme Court commented upon this difficulty in *Wolff v. McDonnell*, 418 U.S. 539, 562 (1974), and described the problem as follows:

> Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner. It is against this background that disciplinary proceedings must be structured by prison authorities; and it is against this background that we must make our constitutional judgments, realizing that we are dealing with the maximum security institution as well as those where security considerations are not paramount. The reality is that disciplinary hearings and the imposition of disagreeable sanctions necessarily involve confrontations between inmates and authority and between inmates who are being disciplined and those who would charge or furnish evidence against them. Retaliation is much more than a theoretical possibility; and the basic and unavoidable task of providing reasonable personal safety for guards and inmates may be at stake, to say nothing of the impact of disciplinary confrontations and the resulting escalation of personal antagonism on the important aims of the correctional process.

To be clear, the Court expresses no opinion on the evidence that was submitted at trial with respect to Defendant's alleged practices of retaliation because, as stated above, this evidence is irrelevant to the Court's decision.  The Court has provided the limited discussion on this topic outlined above for the benefit of the Plaintiff with full consideration towards the fact that Plaintiff has prosecuted this case for many years, primarily pro se, in the hope that this discussion may provide some closure to Plaintiff.

For all of the reasons set forth above, the Court finds in favor of Defendant.  The Clerk of the Court is **DIRECTED** to enter **FINAL JUDGMENT** in Defendant's favor.  The Court reserves jurisdiction over motions for attorney's fees and costs.  The Clerk of the Court is **DIRECTED** to **CLOSE THIS CASE** and all pending motions are **DENIED AS MOOT**.

**DONE and ORDERED** in Chambers, Fort Pierce, Florida, this 27th day of March, 2015.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record